**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MICHELLE J. DARR**, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 3:17-CV-1355-NJR-GCS** |
| | ) |
| **WRB REFINING LP** and | ) |
| **PHILLIPS 66 COMPANY,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on the Motion to Strike (Doc. 42) and the Motion for Summary Judgment (Doc. 40), filed by Defendants WRB Refining LP ("WRB") and Phillips 66 ("Phillips 66"). For the following reasons, the motions are granted in part and denied in part.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are not disputed. Plaintiff Michelle Darr worked as an instrument and control systems designer at Phillip 66's Wood River Refinery ("the Refinery") from 2003 until her termination in 2015 (Doc. 40, Ex. 3, pp. 2-3, 10). Darr's duties included assisting engineers through data entry, drawings, electronic designs, and building and construction packages (Doc. 52, Ex. 9). Darr and other designers worked in offices in trailers (Doc. 52, Ex. 3, pp. 8-9), but went into the field, i.e., to the Refinery, a few times each month to observe design locations (Doc. 52, Ex. 9).

Darr was employed by contractors Emerson Process Management, RCIC ("Emerson") and CTI Field Services, Inc. ("CTI") while she worked at the Refinery (Doc. 40, Ex. 3, pp. 2-3). She worked for Emerson from 2003 until 2008 (Doc. 40, Ex. 3, p. 2), and for CTI from 2008 until 2015 (*Id.* at pp. 2-3). Although the contractors paid Darr, Phillips 66 supervised Darr's work; approved her pay rates, pay raises, and time sheets; and had the authority to terminate her from her position at the Refinery (Doc. 52, Ex. 5, pp. 6-7; Doc. 52, Ex. 9).

In October 2014, Darr was diagnosed with multiple sclerosis ("MS") (Doc. 52, Ex. 9). She was prescribed medication to treat her MS that caused her to miss work on a number of days (Doc. 42, Ex. 3, pp. 24-25). Darr told Alan Schaake, CTI's coordinator for the Refinery, about her diagnosis in late 2014 (Doc. 40, Ex. 8). Schaake told Darr's supervisor, Scott Gallagher, about Darr's diagnosis in December 2014 (Doc. 40, Ex. 3 Doc. 40. Ex. 4). Shortly after, CTI referred Darr to Dr. George Dirkers for a fitness for duty exam (Doc. 52, Ex. 3, pp. 7-8). On December 4, 2014, Dr. Dirkers examined Darr and cleared her for work (Doc. 52, Ex. 4). Dr. Dirkers opined, "She should be able to perform all of her usual job functions and duties, as she has been doing without any need for change at this time," but he suggested Darr avoid hand-over-hand climbing (*Id.*).

In August 2015, Gallagher observed Darr struggling to walk across a parking lot at work (Doc. 40, Ex. 4). He became concerned for her safety, because designers work around machinery and equipment, and sometimes inspect sites that are several stories high (*Id.*). According to Gallagher, "[Darr's] movements were slower, more unsteady and more deliberate than the [other employees], indicating that she was having difficulty

staying upright. Additionally, Ms. Darr had her arms out to her sides, appearing to use them to steady herself" (*Id.*). Tim Rathgeb, a field engineer at the Refinery, was standing next to Gallagher and also noticed that Darr was having trouble walking (Doc. 40, Ex. 6). Rathgeb explained that Darr "looked like she was walking on a tight rope, with her arms up and out to her sides, so as to steady herself" (*Id.*).

Later that day, Gallagher met with Schaake to discuss Darr's condition, and the two agreed that Darr should no longer go into the field, for safety reasons (Doc. 40, Ex. 8, pp. 10-13). On September 1, 2015, Gallagher met with Darr, and Darr agreed to refrain from field work (Doc. 52, Ex. 2, pp. 7-8). On September 2, 2015, Gallagher notified Schaake that he had not identified any work for a designer who could not perform field work (Doc. 40, Ex. 1). On September 10, 2015, Schaake called Darr and informed her that her last day working at the Refinery would be September 11, 2015 (Doc. 52, Ex. 9).

Darr filed this Complaint on December 14, 2017, alleging WRB and Phillips 66 violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, ("ADA"), by terminating her from her employment because of her MS (Doc. 1). On September 5, 2018, Darr disclosed her treating physician, Dr. Ann Cross, as an expert witness (Doc. 42, Ex. 1). On December 21, 2018, WRB and Phillips filed a motion for summary judgment (Doc. 40) and a motion to strike Darr's expert designation of Dr. Cross (Doc. 42). Defendants also seek attorneys' fees and costs associated with bringing their motion for summary judgment (Doc. 40, p. 20 at n.22).

I.      **Motion to Strike**

"The Federal Rules of Civil Procedure divide potential witnesses into three categories for the purposes of disclosure. The first group, fact witnesses, must be disclosed by sending to the opposing party the name, address, and phone number (if known) of each potential witness." *Musser v. Gentiva Health Services*, 356 F.3d 751, 756 (7th Cir. 2004) (citing FED. R. CIV. P. 26(A)(1)(A).) The second and third groups consist of witnesses who provide expert testimony. *Id.* All witnesses who intend to provide expert testimony must be disclosed under Rule 26(a)(2)(A), which provides, "In addition to the disclosures required [regarding fact witnesses], a party shall disclose to other parties the identify of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." *Musser*, 356 F.3d at 756. Witnesses who are "retained or specially employed to provide expert testimony," must also submit an expert report that complies with Rule 26(a)(2)(B). *Id.* at 756-57. The report must be prepared and signed by the witness, and contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the pervious 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. FED. R. CIV. P. 26(a)(2)(B). Non-compliance with Rule 26(a)(2)(B) results in the exclusion of the expert's testimony,

unless the failure was substantially justified or is harmless. *Meyers v. National R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010).

On September 5, 2018, Darr served on Defendants a document titled, "Plaintiff's Expert Witness Disclosure" (Doc. 42, Ex. 1). The Disclosure provides, in whole,

> Plaintiff is disclosing her treating physician, Dr. Ann Cross, whom she previously identified in her Rule 26 Disclosures. She is expected to testify about plaintiff's history of MS as well as her symptoms, diagnosis, prognosis, and treatment, depending on which issues defendants continue to dispute. Plaintiff provided defendant with medical records and releases which contain much of this information.

(*Id.*).

Defendants argue that Dr. Cross is an expert who falls under the requirements of Rule 26(a)(2)(B), and her designation as an expert must be stricken because she failed to submit an expert report. But Darr argues Dr. Cross is not a witness who is "retained or specially employed to provide expert testimony or one whose duties as the party's employee regularly involve giving expert testimony." Instead, Darr asserts that Dr. Cross is testifying as a treating physician and does not fall within the scope of Rule 26(a)(2)(B).

A treating physician is not required to file an expert report if she intends to testify about her treatment, observation, or diagnosis of a plaintiff. *Coleman v. American Family Mut. Ins. Co.*, 274 F.R.D. 641, 644 (N.D. Ind. June 2, 2011) (and cited cases); *Krischel v. Hennessy*, 533 F. Supp. 2d 790, 795 (N.D. Ill. Feb. 6, 2008). The issue becomes more convoluted when the physician also intends to testify about causation, prognosis, or future disability. *Coleman*, 274 F.R.D. at 644. In this case, the parties do not dispute the cause of Darr's condition. Instead, the parties disagree as to whether Darr's MS prevented

her from performing her job duties. Darr expects Dr. Cross to testify about her "history of MS as well as her symptoms, diagnosis, prognosis, and treatment" (Doc. 42, Ex. 1). But as a non-retained expert witness without a Rule 26(a)(2)(B) report, Dr. Cross must limit her testimony to her observations, diagnosis, and treatment of Darr. Dr. Cross may not offer opinions as to Darr's prognosis or her future disability, because this goes beyond Dr. Cross's personal observations and is an opinion that has been essentially formed for the purposes of this lawsuit. *Akins-Brakefield v. Philip Environmental Services Corp.*, No. 08-CV-710-DRH, 2010 WL 1856003, at *2 (S.D. Ill. May 10, 2010). Accordingly, the Motion to Strike (Doc. 42) is granted in part and denied in part.

## II.    Motion for Summary Judgment

Summary Judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658

(7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

Darr's discriminatory discharge claim arises under the ADA, which was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004). Darr proceeds under Title I, which provides, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privilege of employment." 42 U.S.C. § 12112.

## A. The Method of Proof

In the past, district courts utilized different methods of proof to assess the vitality of employment discrimination cases. These methods include the "direct method," the "indirect method," and the "convincing mosaic" approach. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763-64 (7th Cir. 2016). Under the direct method, a plaintiff made her case by pointing to evidence that directly showed her employer subjected her to an

adverse employment action on a discriminatory basis. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (overruled by *Ortiz*, 834 F.3d at 760). Under the indirect method, the parties followed the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first layout a prima facie case of discrimination. *Dickerson v. Bd. of Trustees of Cmty. College Dist. No. 522*, 657 F.3d 595, 601-02 (7th Cir. 2011). Then, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant satisfies this requirement, the burden shifts back to the plaintiff to show the reason was pretext for discrimination. *Id.*

In addition to the direct and indirect methods, courts also employed the "convincing mosaic" approach. *Ortiz*, 834 F.3d at 764. In *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994), the Seventh Circuit used the metaphor of a "convincing mosaic" to "illustrate why courts should not try to differentiate between direct and indirect evidence." *Id.* The Seventh Circuit emphasized that instead of sorting evidence into boxes, "[a]ll evidence should be considered together to understand the pattern it reveals." *Id.* "But instead of persuading district judges and litigants to merge 'direct' and 'indirect' methods into a unified approach, *Troupe* was understood by many as adding a new 'test' that had to be satisfied." *Id.*

In 2016, the Seventh Circuit addressed the murky jurisprudence surrounding the methods of proof in employment discrimination cases. *Ortiz*, 834 F.3d at 760. The Court in *Ortiz* recognized, "The use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years."

*Ortiz*, 834 F.3d at 764. The Court explained that the legal standard

> is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'

*Id.*

*Ortiz* instructs district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* at 765. "*Ortiz*, however, did not alter the burden-shifting framework created by *McDonnell Douglas*." *David v. Board of Trustees of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (internal citations, quotations, and alterations omitted). "*McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence." *Id.* But as *Ortiz* made clear, "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *Id.*

In this case, Defendants argue Darr cannot meet her burden under *McDonnell Douglas* of establishing that their reason for firing her was pretext for discrimination. Darr, on the other hand, argues this is a direct method case, and *McDonnell Douglas* does not apply. But as explained above, the direct vs. indirect distinction is no longer applicable. Darr may use the *McDonnel Douglas* paradigm to meet her burden, but the ultimate question is whether she can overcome Defendants' summary judgment motion by "produc[ing] sufficient evidence to support a jury verdict of intentional

discrimination." *David*, 846 F.3d at 224.

**B. Whether Darr is a "Qualified Individual"**

The ADA prohibits discrimination against "qualified individual[s]," 42 U.S.C. § 12112(a), meaning people who, "with or without reasonable accommodation, can perform the essential functions of the employment position," *Id.* § 12111(8). Defendants allege Darr is not a "qualified individual" because she was unable to go out into the field due to mobility issues, which was an essential function of her job.

**i. Essential Functions of an Instrument and Control Systems Designer**

To determine whether a particular duty is an essential function, courts look at "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004) (internal quotations, citations, and alterations omitted). There is a presumption that the employer's understanding of the essential job functions is correct, unless the plaintiff offers sufficient evidence to the contrary. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010).

CTI's job description for an instrument and control systems designer states that the "major responsibilities" of the job include "prepar[ing] project instrument drawings and other instrumentation documents," "participat[ing] in job site data collection and vendor shop inspections and checkouts as required," and "participat[ing] in field instrument installation verification, loop checkout, commissioning and providing start-up assistance as required" (Doc. 40, Ex. 1, p. 18). Gallagher testified that all of these tasks

require the designer to go into the field (Doc. 40, Ex. 7, pp. 6-9).

Also, Gallagher executed an affidavit stating that field work is an essential function of the job, because designers need to perform field work to conduct visual observations and checks; verify measurements; determine where electronic wiring and other equipment in a drawing are actually located; and verify the location, availability and/or usage of instrument and electrical junction boxes (Doc. 40, Ex. 4). After completing drawings, designers go into the field to check the system drawings and communicate with the individuals tasked with installing electrical and instrumentation systems (*Id.*). Gallagher explains that errors in instrumentation plans, and failure to conform those plans with in-field installation, could lead to serious safety consequences (*Id.*). Joe Neyer, who worked as the Refinery with Darr and was in charge of assigning designers various tasks, executed an affidavit stating that field work is an essential part of a designer's work (Doc. 40, Ex. 5). He explains field work is "critical" to ensure that designs accurately depict the reality of the instrumentation and other equipment in the field at the Refinery (*Id.*). If drawings do not match the conditions in the field, the safety of the operations could be compromised (*Id.*). Schaake also testified that a designer goes into the field as part of his or her job duties (Doc. 40, Ex. 8, pp. 3-4, 24-25, 30-31). He stated that Darr did, in fact, perform field work during her employment at the Refinery (*Id.*). Darr confirmed during her deposition that she went into the field a few times each month (Doc. 52, Ex. 9).

But Darr argues field work was not an essential function of her job because other designers could go into the field for her. She points to Schaake's deposition, where he

testified that any designer could go into the field to make visual observations and verify locations for a drawing (Doc. 52, Ex. 3, pp. 18-19). This argument misses the mark. The question is whether Darr could perform the essential functions of her job; not whether other employees could perform those functions for her. *See Rogers v. Chicago Board of Educ.*, 261 F. Supp. 3d 880, 885 (N.D. Ill. June 8, 2017) (rejecting the plaintiff's argument that other employees could have assisted with the more physical aspects of her job because the "argument asserts that *other* employees could perform her essential job duties, not that she could") (emphasis in original).

Darr also states that during the eight months leading up to her termination, her supervisors permitted her to determine whether she was able to go into the field on a day-to-day basis. She cites an email she sent Schaake on December 4, 2014, which states "Scott [Gallagher] made it clear that I can judge my trips to the field base [sic] on day to day" (Doc. 52, Ex. 12). Defendants point out that the email is hearsay, but, regardless, a special assignment is not evidence that certain duties are non-essential. *See Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) (finding that the job duties of an adjusted position, created to accommodate the plaintiff's limitations, were not evidence of the essential job functions); The Seventh Circuit has explained, "Absent independent evidence that [a] function was non-essential, we do not believe it wise to consider [a] special assignment as proof that [the function] was not an essential function because it would punish [the employer] for going beyond the ADA's requirements." *Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001). Thus, the fact that Defendants may have allowed Darr to perform her job without going into the field does not suggest that field work was

non-essential.

In sum, Defendants believe field work was an essential function of Darr's job, the official job description requires field work, Darr actually performed field work while in the position, and if designers do not perform field work, the safety of the operations is compromised. Darr has not produced competent evidence that raises a genuine dispute of material fact as to whether field work was an essential function of her job, or to overcome the presumption that Defendants' understanding of the job is correct. Thus, the inquiry turns to whether Darr could perform field work with or without accommodations.

### ii. Darr's Ability to Perform the Essential Functions of Her Job

Defendants argue Darr is not a qualified individual because she could not perform field work without jeopardizing workplace safety. An individual is not qualified under the ADA if she poses "a direct threat to the health or safety" of herself or others. *Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 569 (7th Cir. 2016). A "[d]irect [t]hreat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). The "direct-threat defense" is an affirmative defense, so the employer bears the burden of proof. *Felix*, 828 F.3d at 569. The defense "requires an individualized assessment, based on reasonable medical judgment, of an employee's present ability to safely perform the essential functions of [her] job." *Id.* Courts should consider: (1) the duration of the risk posed by the employee's condition; (2) the nature and severity of the potential harm that might result; (3) the likelihood that the potential harm will occur; and (4) the imminence

of the potential harm. *Id.*

Defendants state they do not rely on the "direct threat" analysis in support of their motion for summary judgment. Instead, they "assert that it was appropriate for [Phillips 66]—as it is for this Court—to consider the undisputed evidence that [Darr's] mobility limitations rendered her unable to perform the essential functions of her job" (Doc. 40, p. 13 at n.14). But Defendants' entire argument rests on the notion that Darr could not perform field work because of potential safety risks. Regardless of how Defendants choose to frame this theory, they assert a "direct threat" defense. *See Felix*, 828 F.3d at 571 (explaining that the direct-threat-defense applies when an employer argues the plaintiff poses a safety risk). Either way, Defendants have not established, as a matter of law, that Darr could not perform the essential functions of her job.

Neither party has set forth a medical opinion regarding Darr's ability to perform her job at the time she was terminated.[1] Instead, Defendants highlight Darr's medical records from August and September 2015, which document Darr's mobility complaints. Specifically, on August 19, 2015, Darr presented to St. Anthony's Health Center for a balance screening (Doc. 40, Ex. 1, p. 56). The treatment provider noted that Darr was a "severe fall risk" due to neuropathy in the bilateral upper and lower extremities (*Id.*). On August 28, 2015, Darr completed a questionnaire at St. Anthony's and reported she experienced dizziness/blackouts, coordination problems, loss of balance, and difficulty walking within the previous year (*Id.* at pp. 62-63). An occupational therapy evaluation

[1] Dr. Dirkers conducted the fitness for duty exam in December 2014, roughly nine months before Darr's termination.

from St. Anthony's, dated September 2, 2015, includes complaints of difficulty walking, disequilibrium, lightheadedness, rocking or swaying, diplopia floating, being disconnected, and "falls or near falls" (*Id.* at p. 30). The therapist noted Darr's right and left gross coordination, bilateral integration, and visual motor skills were impaired and she had a marked deviation in her gait pattern (*Id.* at p. 29).

Darr disputes that her medical records establish she was incapable of field work. She cites a record from Washington University, dated September 14, 2015, where her doctor states she had "[n]o real change in complaints," and her neurological exam was "basically normal except [she] ha[d] slight clumsiness [on the] right leg on heel to shin" (Doc. 52, Ex. 8). The record also notes Darr "[w]alk[ed] normal and runs OK but has slight instability on Romberg testing" (*Id.*). Darr also points to a medical record from November 4, 2014 that documents symptoms similar to the ones described in the records cited by Defendants (Doc. 52, Ex. 10). The November 2014 record states Darr felt clumsy, often fell into things, had difficulty balancing, and experienced numbness in both arms and legs (*Id.*). Darr points out that despite these complaints, she continued to work at the Refinery for another nine months.

Defendants also note that Darr applied for Social Security Disability benefits on September 23, 2015, shortly after she was terminated, and indicated on her application that she was unable to work because of her disability (Doc. 40, Ex. 2, p. 3). Darr asserts the Social Security application is not indicative of her limitations. She insists it was "reasonable" to apply for Social Security benefits because she had just been fired because of her MS. Darr points out that she did not pursue the application and did not receive

benefits.

"[T]he ADA's determination of disability and a determination under the Social Security disability system diverge significantly in their respective legal standards and statutory intent . . ." *Weiler v. Household Finance Corp.*, 101 F.3d 519, 523-24 (7th Cir. 1996). Thus, Social Security disability determinations and a claimant's representations of "total disability" may not be dispositive of whether an individual is a "qualified individual" under the ADA. *Weigel v. Target Stores*, 122 F.3d 461, 467 (7th Cir. 1997). But a claimant's representation to the Social Security Commission is not totally irrelevant. *Id.* "When employees (and/or their physicians) represent that they are 'totally disabled,' 'wholly unable to work,' or some other variant to the same effect, employers and factfinders are entitled to take them at their word; and, such representations are relevant evidence of the extent of a plaintiff's disability, upon which an employer may rely in attempting to establish that an ADA plaintiff is not a 'qualified individual.'" *Id.* at 467-68. Accordingly, Darr's statements on her unsuccessful Social Security application are relevant, but not dispositive, of whether she was able to perform her essential job functions.[2]

Defendants also rely on emails between Gallagher and Schaake from September 2015 (Doc. 40, Ex. 1, pp. 42 & 46). On September 1, 2015, Gallagher wrote to Schaake, "Alan, I talked to Michelle this morning. I informed her I do not want her going into the

---

[2] Darr relies on the Supreme Court case *Cleveland v. Policy Mgmt. Systems Corp.*, 526 U.S. 795, 805 (1999), where the Court stated, "[I]f an individual has merely applied for, but has not been awarded, [Social Security] benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." Darr also cites *Lee v. City of Salem, Ind.*, 259 F.3d 667, 673 at n.3 (7th Cir. 2001), where the Seventh Circuit limited the scope of its opinion to the plaintiff's successful Social Security applications. But those cases address whether a plaintiff in an ADA case is judicially estopped from asserting a position that is different from the one in the plaintiff's Social Security application. Judicial estoppel is not at issue here.

plant due to her mobility limitations. She was fine with that and acknowledged she is not able to perform duties in the field as in the past" (*Id.* at p. 42). On September 2, 2015, Schaake wrote to Gallagher, "Scott, I met with Michelle today over lunch. We discussed the recent decision to not allow her to go into the plant . . . Michelle agreed that based on her physical limitations at this time, not being allowed to go into the plant is the right decision" (*Id.* at p. 46). Gallagher testified he spoke with Darr about not going into the field, and "she was okay with that" (Doc. 40, Ex. 7, p. 4).

Darr states in her affidavit that she never told Gallagher or any other Phillips 66 employee that she could not perform field work (Doc. 52, Ex. 6). At her deposition, Darr admitted she may have replied "okay" when Gallagher told her he did not want her going into the field (Doc. 40, Ex. 3, pp. 26-27). But she states she did not agree with the restriction and responded "okay" out of respect for Gallagher's decision, because he was her supervisor (*Id.*). Darr states in her affidavit that, had she not been fired, she could have performed all of her duties, including field work (Doc. 52, Ex. 6).

Defendants also cite Darr's testimony that she told Schaake in early September 2015 that she anticipated being unable to go into the field at some point due to mobility issues (Doc. 40, Ex. 9, pp. 2-3). This statement provides little support for Defendants' position. The issue is whether Darr was able to perform her essential job functions at the time she was terminated, not at some future point in time. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("[A plaintiff's] ability to work, or to otherwise perform the essential functions of her job, is examined as of the time of the adverse employment decision at issue.").

All-in-all, there is plenty of conflicting evidence about Darr's limitations. Although a jury could infer from the objective evidence that Darr was unable to perform her job functions, it is not such an exclusive inference that Defendants are entitled to summary judgment. Defendants cite *Wheatley Factory Card and Party Outlet*, 826 F.3d 412 (7th Cir. 2016), and *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034 (7th Cir. 2013), but those cases are distinguishable. In *Wheatley*, there were unfavorable medical opinions against the plaintiff about her ability to work, and the plaintiff did not provide any evidence to the contrary. *Wheatley*, 826 F.3d at 415. In *Basden*, the plaintiff's attendance was erratic and violated the employer's attendance policy, and she could not anticipate a date by which she expected to be able attend work on a regular basis. *Basden*, 714 F.3d at 1038. Here, there is no indication Darr's disability significantly interfered with her attendance, there is no medical opinion of record that Darr could not work, and Defendants' decision to preclude her from performing field work was based on their own assumptions about her condition.

Alternatively, Defendants have not proven a direct-threat-defense. They do not present evidence that a "reasonable medical judgment" compels summary judgment, because, again, they do not offer an opinion from a medical expert concerning Darr's ability to perform her job. *See Rednour v. Wayne Twp.*, 51 F. Supp. 3d 799, 823-24 (S.D. Ind. Sept. 24, 2014). In fact, the only relevant medical judgment comes from Dr. Dirkers's fitness for duty exam, which took place roughly nine months before Darr's termination and concluded that Darr could perform all of her job functions (Doc. 52, Ex. 4). Also, this is not a case where a medical opinion is unnecessary to establish the direct-threat-defense,

because there is not enough unfavorable non-medical evidence against Darr. For comparison, in *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662 (7th Cir. 2000), a physician brought a discriminatory discharge claim against her former employer after being discharged for behavior associated with alcoholism. The employer began investigating the plaintiff after a patient complained that the plaintiff smelled like alcohol during her appointment. *Bekker*, 229 F.3d at 665. The employer conducted interviews with the plaintiff's coworkers and patients, and a medical assistant stated she smelled alcohol on the plaintiff at least once a week, the plaintiff's eyes were glassy on those occasions, and patients and employees commented on the alcohol odor; a nurse said that plaintiff smelled like alcohol two or three times a week over the previous two years and that patients commented about the smell; another employee reported the plaintiff smelled of alcohol on a weekly basis, the plaintiff's face was flushed on these occasions, and patients commented about an alcohol smell; two nurses confirmed they smelled alcohol on the plaintiff and that other employees had spoken of the situation; and a week or two before the investigation, another physician smelled an alcohol odor on the plaintiff. *Id.* The district court granted summary judgment in favor of the employer, finding that the plaintiff was a direct threat to the health and safety of her patients. *Id.* at 668. The plaintiff argued there was no objective medical evidence to support this conclusion, and she had not actually made any poor medical judgments. *Id.* But the district court disagreed, stating there was ample evidence that the plaintiff was a direct threat, as demonstrated by the numerous reports of people who smelled alcohol on her while at work, and reports of several employees who observed her with glassy eyes. *Id.* The plaintiff appealed, and

the Seventh Circuit affirmed the district court's decision. *Id.* at 672.

Unlike *Bekker*, this case does not present a barrage of evidence against Darr. Here, Defendants rely on evidence that, on a single occasion, two individuals saw Darr struggling to walk; Darr applied for Social Security benefits and stated she was unable to work, after her employer told her that her disability prevented her from maintaining employment; medical records state Darr was a severe fall risk and had marked gait disturbances, while another record states her neurological test was normal and she could walk and run; and Darr agreed with her supervisor's instructions not to perform field work. In sum, Defendants have not demonstrated that "the evidence on the question of direct threat is so one-sided no reasonable jury could find" for Darr. *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004). Summary judgment is not warranted on this basis.

### C.  Whether Darr Can Establish Causation or Pretext

Defendants argue they are entitled to summary judgment because Darr cannot establish causation or prove that their reason for firing Darr was merely pretext for discrimination.

To succeed on a claim of discriminatory discharge under the ADA, a plaintiff must show she was terminated "because" of her disability. *Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 843 (7th Cir. 2015). This requires a plaintiff to establish her disability was a "but for" cause of her termination. *Id.* When an employer offers a legitimate, non-discriminatory reason for the plaintiff's termination, the burden shifts to the plaintiff to establish that the proffered reasons were actually pretext for discrimination. *Ennin v. CNH Industrial America, LLC*, 878 F.3d 590, 596 (7th Cir. 2017).

Defendants state they fired Darr because they honestly believed she was no longer able to perform essential aspects of her job in the field due to her mobility limitations. According to Defendants, Darr cannot show that this reason was pretextual. Defendants note they did not fire Darr until Gallagher observed her struggling to walk, which was many months after Defendants learned about Darr's diagnosis. Defendants also state there is no evidence Gallagher discriminated against any other employee because of a disability. They point out that several individuals attested that Gallagher acted out of genuine concern for Darr's well-being.

Darr argues Defendants are splitting hairs by distinguishing her disability from the symptoms of her disability. Darr contends that firing her because of her perceived mobility problems—a symptom of MS—is the same as firing her because of her MS. But this is not an accurate statement of the law. "The [ADA] forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions based on the actual attributes of the handicap." *Anderson v. Univ. of Wisconsin*, 841 F.2d 737, 740 (7th Cir. 1988); *see Felix*, 828 F3d at 564 ("[A]n employer may, consistent with the ADA . . . terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability . . ."); *Palmer v. Circuit Ct. of Cook Cty., Ill.*, 117 F.3d 351 (7th Cir. 1997) (employer not liable under the ADA for firing social worker with a mental illness who threatened a coworker and supervisor with violence, even though the threats were attributable to the plaintiff's disability).

Nonetheless, Defendants' causation and pretext argument hinge on their assertion that Darr could not safely perform her job because of her mobility limitations associated

with MS. But it is ultimately unclear whether Darr was unable to perform her job duties, or whether Defendants wrongfully assumed she could not perform her job duties, because of her disability. If the latter is true, this conduct "smacks of exactly the kind of speculation and stereotyping that the statute was designed to combat." *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012 (7th Cir. 2001). Accordingly, Defendants have not met their burden of establishing a legitimate, non-discriminatory reason for Darr's termination, or proving that Darr cannot establish causation as a matter of law. Summary judgment is not warranted on these bases.

### D. Whether WRB Was Darr's Employer

Finally, WRB argues it is entitled to summary judgment because it is not an "employer" under the ADA. The ADA provides that an "employer" is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). WRB submitted an affidavit from its human resources manager, Chris Johnson, who attests WRB has not, at any relevant time, employed 15 or more individuals (Doc. 40, Ex. 11). Darr admits she has no evidence to refute this assertion. Accordingly, the motion for summary judgment is granted as to Defendant WRB, and WRB is dismissed from this case with prejudice.

### III.    Motion for Attorneys' Fees and Costs

"The ADA gives the district court discretion to award attorneys' fees to a 'prevailing party.'" *Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306, 307 (7th Cir. 1998) (quoting 42 U.S.C. § 12205). "[A]n award of fees to an employer is appropriate only when

the suit is brought in bad faith or when it is frivolous, unreasonable, or without foundation." *Id.*

Here, Defendants seek attorneys' fees and costs associated with bringing their motion for summary judgment (Doc. 40, p. 20 at n.22). They argue it is "troubling" that Darr stated she was unable to work in her application for Social Security benefits, but then stated under penalty in her EEOC Charge that she could perform all of the essential functions of her job. But Phillips 66 is not a "prevailing party," and, as explained above, the standard for acquiring Social Security benefits is different than that for proving an ADA claim. Thus, Defendants have not demonstrated that this suit is frivolous, unreasonable, or without foundation. Their motion for attorneys' fees and costs is denied.

## Conclusion

For these reasons, the Motion to Strike (Doc. 42) filed by Defendants is **GRANTED in part and DENIED in part**. Dr. Cross may testify about her observations, diagnosis, and treatment of Darr, but may not opine as to Darr's prognosis or future disability. The Motion for Summary Judgment (Doc. 40) filed by Defendants is also **GRANTED in part and DENIED in part**. The motion is granted as to Defendant WRB Refining LP, who is dismissed from this case with prejudice. The motion is otherwise denied. Defendants' Motion for Attorneys' Fees and Costs is also **DENIED**.

**IT IS SO ORDERED.**

**DATED:  June 3, 2019**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**